## UNITED STATES v. COTTON VALLEY OPERATORS COMMITTEE et al.

### Civ. No. 2209.

District Court, W. D. Louisiana,
Shreveport Division.

April 22, 1948.

See also 8 F.R.D. 35.

Tom C. Clark, Atty. Gen., Jno. F. Sonnett, Geo. B. Haddock, W. B. Watson Snyder and Jas. R. Browning, Sp. Asst. Attys. Gen., and Malcolm E. Lafargue, U.S. Atty., of Shreveport, La., for plaintiff.

Jno. M. Madison, W. S. Wilkinson, Wilkinson, Lewis & Wilkinson, Jno. T. Gayton, J. R. Goff, and Sidney G. Myers, all of Shreveport, La., and Vernon Roberts, of Ada, Okl., for defendants.

DAWKINS, District Judge.

The general nature of the complaint in this case is described in the opinion filed herein on January 21, 1948 75 F.Supp 1. We now have for consideration three additional motions, to-wit: (1) By some 20 odd defendants for a more definite statement of facts upon which the demand is founded; (2) By the Ohio Oil Co., for the production of certain documents; and (3) a motion to dismiss.

Taking these motions up in the order named (1) requests further information with respect to Articles 10, 11, 13, 14, 15, and 16 of the complaint.

The request as to paragraph 10 has been voluntarily answered by the complainant to the satisfaction of the defendants.

At the oral argument of this motion, after hearing both sides, the request as to Article 11 of the complaint consisting of paragraphs 2, 3, and 5, through 8, were denied from the Bench; while No. 4 had also been answered by complainant to the satisfaction of defendants.

As to Article 13 of the complaint referred to in paragraph 9 of the motion for particulars, the complainant is asked: "What was the nature of any agreement (tacit or otherwise) between defendants herein (other than those agreements expressed and contained in the 'Cotton Valley Unitization and Pressure Maintenance Agreement') to which it is claimed that this defendant was a party and when and with whom such agreement or agreements made or by what acts or actions was such agreement or conspiracy made manifest?"

Article 13 of the complaint alleges that: "Said combination and conspiracy (to monopolize and restrain trade in the products of the field, other than what was reinjected for conservation and to increase production) has consisted of a continuing agreement and concert of action among defendants, the substance and terms of which were and are, defendants."

Then follows sub-paragraphs (a) through (d) charging that defendants did agree, while so engaged, "to exclude others" (a) from the business of extracting, processing, and refining various hydrocarbons; (b) from the business of distributing and selling said products; (c) to sell jointly through channels selected by themselves; and (d) to fix uniform prices, terms and conditions of sale, involving over 85 per cent of the "natural flow of liquid and gaseous hydrocarbons produced from the field and not reinjected therein."

The motion, in paragraphs 9 through 15, both inclusive, requests that complainant (9) state the "nature of any agreements" with persons other than defendants, after unitization and pressure maintenance agreements, outside of and beyond the signed document approved by the Department of Conservation of the state, which it is claimed defendants entered into, giving the names of the parties thereto besides themselves; (10) "by what means and in what manner * * * defendants undertook to exclude others" from any of such activities; (11) the nature of the business in which the defendants agreed to engage other than extracting and reinjecting the substances into the field, "where the same was conducted; and at what point or in what manner or by what means could said operations be recog-

nized or identified"; (12) the means and manner used to exclude others from the business of distributing and selling the products taken from the field; (13) nature of the agreement relating to sale and distribution, other than the sale of defendants' own products upon the open market, and with whom made; (14) through what channels did defendants agree to sell; with whom and how did such agreements arise, for how long did each continue, and how were such channels generally selected; (15) what were the prices, terms and conditions agreed upon and in what respects those prices did not conform to those established and available upon the open market, as well as the persons and dates on which said agreements were made, etc.

As to paragraph 9 (art. 13 of the complaint) the nature of the alleged agreement is described in general terms in said paragraphs 13(a) through 13(d) of the complaint, as having been between the large number of defendants charged, sufficiently, it is believed, to apprise them that it was to permit them to control the residue of production remaining after extracting and reinjecting certain elements into the field for the purpose of greater recoveries, including refining, distributing and selling at uniform prices agreed on between them and by excluding all others from any of these activities.

The details as to which of the defendants refined, distributed, shipped, marketed or sold these products and fixed the prices therefor, including the choosing of the channels of operations, to the exclusion of others, whether carried on through third persons or agencies or by the defendants themselves, involved matters of evidence or proof, it is believed, which did not have to be alleged. Defendants may have recourse to interrogatories under No. 33 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, for any additional information to which they may be properly entitled.

Paragraph 16 of the motion deals with Article 14 of the complaint. This article charges as follows: "14. The continuing agreements, understandings and concerted action of the defendants set out in para-

graphs 11 and 12 of this complaint do not contribute to the conservation of the oil and gas resources of the Field or of the State of Louisiana, or prevent the waste and depletion thereof. Said agreements, understandings and concerted action are not necessary, and do not contribute, to the separation of any of the liquid and gaseous hydrocarbons taken from the Field, nor to the reinjection of a residue of liquid and gaseous hydrocarbons under pressure into the natural reservoirs of the Field. Said agreements, understandings and concerted action are not authorized by Act Number 225 of the Legislature of the State of Louisiana of 1936, Act Number 157 of the Legislature of the State of Louisiana of 1940, nor by Order Number 10-B, dated July 1, 1940, Order Number 10-C, dated January 28, 1941, nor any other order issued by the Commissioner of Conservation of the State of Louisiana."

Defendants asked "in what respects * * * it is claimed that * * * operations * * * by defendants did not contribute to conservation * * * or were not authorized by statute or order of the Commissioner of Conservation * * * and at what point in the course of such operations did defendants depart from conservation and administrative authority?"

■ It must be assumed, it would seem, that in the course of the investigation preceding the filing of the complaint, complainant determined the nature of the operation up to the point where permissible acts of conservation ended and the alleged illegal combination and conspiracy in restraint of trade and commerce began. In order to prevail, it will have to make proof of this sufficiently to enable the Court to draw the line and be able to say that "so far your conduct was proper, but beyond this, you began to violate the Sherman Act [15 U.S.C.A. § 1 et seq.]." The situation presented in this case is unique, in that the complaint as pointed out in the former opinion, set forth the background and history of operations in this field, which it says were proper acts of conservation, having the approval of the state agency, even though the defendants were acting in concert. It then proceeds to charge that certain other activities which were necessary to a realization of the profits or benefits in money from production were illegal. Extraction of the elements from the field production, by refining or otherwise, their transporting and marketing, were not illegal in themselves, but became so only when a point had been reached where the public or those desiring, could participate therein under the conditions which prevailed. Was it at the mouth of the well where the carbohydrons were withdrawn, at the tanks if storage existed in the field, or at some other point, if the residue had to be transported by pipe lines. It can easily be conceived that a single extraction plant or a refinery existed in the field or vicinity, which was also operated by defendants, who conceived and put into effect the measures of conservation. If so, did any situation arise that compelled them to construct pipe lines or otherwise provide means of transportation for the use of competing refineries or operators, or can it be made to appear that there were already operating, facilities of competitors, who were denied the right to purchase those products at points available to the public? It is true that defendants must be familiar with conditions in the area, and no doubt have in their possession, records of whatever transactions took place; but charges such as those made in the complaint are quasi criminal, and as defendants' counsel say, if the Government prevails, may be taken advantage of by other private litigants to recover triple damages from these defendants. In fact, the Sherman Act is primarily criminal in its nature, but permits civil remedies, such as are sought here by the Government, to prevent its violation; and the character of the combination and conspiracy should be set forth with sufficient particularity to permit defense, if such exists. Facts should be furnished to show when and where the illegal activity began and by what means competitors were excluded.

If the defendants in this case were stockholders or officers in a single corporation, operating in the Cotton Valley Field, there would appear to be no reason why they could not acquire any part of the production, transport it in the crude state, by pipeline or otherwise, separate its constituent elements in the field, if facilities existed

there, or carry it to refineries operated by themselves and then distribute and sell the finished product, as is done by most big companies throughout the country. On the other hand, if, because of the peculiar conditions, it was necessary that the owners of independent interests in the field should pool the same for the purpose of efficient and profitable recovery, under a system recognized and approved by proper authorities, a point might be reached where a continuation of that pooling of interest might become illegal, if it involved a substantial portion of production, to which the public had access before the necessity for conservation measures arose, and they were denied such rights through refusal of defendants to permit these competitors to participate, after the acts of conservation had been completed. There should be some allegation of fact as to just what was done to bring about a monopoly and the exclusion of competitors other than the legal conclusions that such monopoly existed and caused the exclusions.

Paragraph 16(a) through 16(d) of the complaint, under the heading "effects" alleges that the conduct of defendants "excluded other persons and companies from the business" (a) of extracting and processing the hydrocarbons, (b) from selling and marketing, (c) transporting and (d) refining and distributing the same.

Defendants asked that complainant be required to give the names and manner in which other persons were excluded from all the activities covered by these four subdivisions of the complaint.

Here again, the complaint should give a reasonable outline of the conditions in the field that (1) made the products available to public participation in their commerce, and (2) the available facilities and outlets making competition possible such as refineries, pipelines, etc., which were excluded. In all other respects the motion for particulars or further statement of facts will be denied.

### The Motion of Ohio Oil Company to Produce Certain Documents.

The issues presented by this motion are the same as were considered in an almost identical motion by the Magnolia Petroleum Co. in the opinion handed down on January 21, 1948. After further consideration the Court is of the view that this motion should likewise be denied for the reasons stated in that opinion.

### Motion to Dismiss.

The motion to dismiss is based on the contention that in pooling their interests in the Cotton Valley field, pursuant to the requirements of the state statute and orders of the Conservation authorities, the defendants became owners in indivision of the production under their control, with the right to make agreements for handling it to their mutual profit or benefit; further, that the nature of the substances produced and the only means for separating the constituent elements for marketing made impracticable, though not impossible, a division in kind at any given point prior to realization, without consequent loss or added expense. State decisions, as well as Federal cases are cited to the point, that there is no ownership in these fugacious minerals until brought to the surface and reduced to possession, but only a common right in the surface owners to explore therefor and bring about such possession; from which it follows that the state, under its police power, may regulate the same by requiring, pooling and sharing in production, to prevent economic waste and to insure each surface owner his fair share.

There is no question, that, in Louisiana, the nature of the right of surface owners in minerals is such that the state possesses and in recent years has exercised extensively its power of control and regulation by compelling landowners in many fields, where ownership was in small tracts, to pool their interests and to share in production through one or more wells for an entire block, according to acreage owned. In such situation, up to the point where the minerals pass into commerce, there exists a joint or common enterprise. Usually, the drilling or marketing is done by one or more leasees, who provide storage or access to pipelines, and the surface owners are paid in accordance with what are commonly called "division orders".

414

However, where, as alleged here, 85 per cent of the producing area is leased to a number of lessees and they, together with the surface owners, are compelled, by virtue of the said requirements of conservation to pool that percentage of a field of the size of Cotton Valley, a situation is created whereby it is made possible for such a group, if the product happens to be of premium quality, to monopolize the same and to demand high prices, so long as competition can be kept out. And the temptation to do so is increased by the extent of participation of the several interests in those profits; whereas, if competition in the purchase, refining and marketing were allowed to have free play, such premium production might be held to its fair value by those who were willing to take a reasonable profit instead of demanding all the traffic would stand.

In general terms this appears to be what the complaint intends to charge; although as stated in passing upon the motion for particulars or a more definite statement of facts, it has not been made clear just where the line of demarcation between conservation and the alleged monopolistic operations lies. Undoubtedly, if persons, such as are the defendants, according to the complaint, without compulsion for conservation, voluntarily entered into an agreement to pool 85 per cent of production in a field such as this, and to exclude from participation all others, through all steps to ultimate realization of the profits or benefits, which are the controlling reasons for all business enterprises, it could hardly be contended, that such a course was not within the purview of the anti-trust laws. If this were permissible as to one field, no reason can be seen why it could not be extended to others, and thus bring about a condition similar to that which precipitated dissolution of the original Standard Oil Company years ago.

It is believed that when complainant shall have complied with the ruling for a more definite statement of the cause of action, the issues of fact and law will appear sufficiently to warrant a trial on the merits.

The motion to dismiss will therefore be overruled.

Proper decree should be presented.