**ASSINIBOINE AND SIOUX TRIBES OF THE FORT PECK INDIAN RESERVATION, MONTANA, William Youpee, a Member of the Assiniboine and Sioux Tribes of the Fort Peck Reservation on Behalf of Himself and All Members of the Tribes, Plaintiffs,**

v.

**CALVERT EXPLORATION COMPANY, G. W. Yoder, Chairman, Ted Hawley, Vice Chairman, E. L. Anderson, Member, Allen Zimmerman, Member, Winston L. Cox, Member of the Oil and Gas Conservation Commission of the State of Montana, Defendants.**

Civ. No. 2367.

United States District Court
D. Montana,
Havre-Glasgow Division.

Nov. 27, 1963.

Marvin J. Sonosky, and John S. White, Washington, D. C., and Wiggenhorn, Hutton, Schiltz & Sheehy, Billings, Mont., for plaintiffs.

Forrest H. Anderson, Atty. Gen., of Montana, and John H. Risken, Commission Atty., Helena, Mont., for defendant members of the Montana Oil and Gas Conservation Commission.

JAMESON, District Judge.

This is an action by two Indian tribes to enjoin Calvert Exploration Company from proceeding under an order of the Montana Oil and Gas Conservation Commission insofar as the order affects two tribal oil and gas leases and the oil and gas underlying those leases, and to enjoin the individual members of the Commission from enforcing the Commission's order or any other order affecting the tribal leases. The facts are stipulated in a pretrial order, and both sides have moved for summary judgment.

Jurisdiction of this court is invoked under 28 U.S.C. § 1331, which requires that the matter in controversy exceed "the sum or value of $10,000" and that the action arise "under the Constitution, laws, or treaties of the United States".

Calvert is the holder of the lessee's interest in 160 acres consisting of two contiguous 80 acre tracts. One tract is owned by the tribes, and the second tract is owned by others. In a prior order the Commission had designated the area in which the two tracts lie as the Benrud Field and had specified spacing units of 160 acres.

Calvert sought voluntary approval of the landowners for a pooling arrangement to meet the 160 acre spacing requirement, thereby allowing Calvert to drill on the land. Failing to obtain this approval, Calvert applied to the Montana Oil and Gas Conservation Commission for an order under Section 60–130, R.C.M. 1947,[1] pooling all interests within the 160 acre unit. The tribes moved to dismiss Calvert's application on the ground that the Commission was without jurisdiction over the tribes or the oil and gas.

The Commission entered an order denying the tribes' motion to dismiss, assuming jurisdiction, granting the appli-

1. Section 60–130, R.C.M.1947, relates to the pooling of interests within a spacing unit and provides that, "In the absence of voluntary pooling, within the spacing unit, the commission, upon the application of any interested person, may enter an order pooling all interests in the spacing unit for the development and operation thereof."

cation of Calvert, and ordering that the production of oil and gas from the 160 acres "be and the same are hereby pooled, integrated and unitized" as of December 6, 1962, the date the order was entered.

This action was commenced on January 10, 1963. On that date Calvert was drilling an oil and gas well at a depth of 7400 feet on the 80 acre tract owned by the tribes. Shortly thereafter the well was plugged and abandoned as a dry hole at a depth of 7651 feet.

Plaintiff contends that the Commission order is void in that (1) it constituted an alienation of tribal property in violation of 25 U.S.C. § 177;[2] (2) even if alienation of tribal property were authorized, the United States would be an indispensable party, and it was not a party nor had it consented to be a party to the proceedings before the Commission; (3) Congress has vested the power to unitize or communitize tribal oil and gas exclusively in the Secretary of the Interior (25 U.S.C. § 396d) [3] whose regulations call for prior approval of any unit or cooperative agreement by the Secretary and by the Indian tribe affected (25 CFR 171.21(b)); [4] and (4) on January 10, 1961, there was a well 7400 feet deep being drilled on the tribes' land and on its face this establishes a value in excess of $10,000, exclusive of interest and costs.

Defendants contend that the Commission is an administrative agency of the State of Montana whose function is to supervise and regulate the oil and gas industry in Montana insofar as that business is concerned with discovery and production of oil and gas; that the Commission's principal duty is to prevent waste of these two types of energy; that the Commission delineated Benrud Field embracing the subject land, as an oil field and ordered development on the basis of one well per 160 acre spacing unit; that one such unit embraced the 160 acres in suit; that on application of Calvert, the Commission pursuant to a hearing held, after notice, entered its order pooling all interests within the unit embracing the subject 160 acres; that a well was drilled; that no oil was recovered in commercial quantities and the well was plugged and abandoned; that there is no amount in controversy; and that the court has no jurisdiction.

■ The jurisdictional amount must be tested as of the date the jurisdiction of the court was invoked, and "the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." St. Paul Mercury Indemnity Co. v. Red Cab Co., 1938, 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845.[5] The plaintiff-

2. 25 U.S.C. § 177 provides in pertinent part: "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."

3. 25 U.S.C. § 396d provides:
"All operations under any oil, gas, or other mineral lease issued pursuant to the terms of any act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior. In the discretion of the said Secretary, any lease for oil or gas issued under the provisions of sections 396a–396g of this title shall be made subject to the terms of any reasonable co-

operative unit or other plan approved or prescribed by said Secretary prior or subsequent to the issuance of any such lease which involves the development or production of oil or gas from land covered by such lease."

4. 25 CFR § 171.21(b) provides that oil and gas leases on Indian lands " * * * shall be subject to any cooperative or unit development plan affecting the leased lands that may be required by the Secretary of the Interior, but no lease shall be included in any cooperative or unit plan without prior approval of the Secretary of the Interior and consent of the Indian tribe affected."

5. See also a comprehensive review of the authorities in Stewart v. Shanahan, 8 Cir. 1960, 277 F.2d 233, 236, where the court said: "Generally, the question of juris-

viewpoint rule for determining the amount in controversy for jurisdictional purposes has been applied in actions seeking equitable relief, including injunction actions. See 1 Moore's Federal Practice 0.95 and 0.96(1), (2), pp. 862–870.

■ On the date the complaint was filed Calvert Exploration Company was still drilling for oil and gas on the tribal lands. The well had been drilled to a depth of 7400 feet. This would indicate value of the leasehold substantially in excess of $10,000.[6] It is immaterial that thereafter the well was abandoned as a dry hole.

It is stipulated that the tribal lands in suit are located on the Fort Peck Indian Reservation.[7] Apparently there is no contention that the matter in controversy does not arise under the laws of the United States. 25 U.S.C. § 177 (footnote 2) prohibits the disposition or alienation of tribal land except as authorized by Congress. Federal Power Commission v. Tuscarora Indian Nation, 1960, 362 U.S. 99, 118–119, 80 S.Ct. 543, 4 L.Ed.2d 584.

■ It is well settled also that "inclusion within a State of lands of the United States does not take from Congress the power to control their occupancy and use, to protect them from trespass and injury and to prescribe the conditions upon which others may obtain rights in them, even though this may involve the exercise in some measure of what com-

monly is known as the police power". Utah Power & Light Co. v. United States, 1917, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791, 816.

■ There is little, if any, dispute regarding the rules of law here applicable. Defendants concede that 25 U.S.C. § 396d (footnote 3) requires the consent of the Secretary and the Indian tribes before tribal land may be included in a "unit agreement" or "unit operating agreement". They contend, however, that there is a distinction between these agreements and the "spacing unit" or "well spacing unit" order here involved; that neither the statute nor applicable regulations purport to govern spacing units; and that, in the absence of such action by the federal government, the order was a proper exercise of the state's police power to prevent waste. I agree that there is a clear distinction between unit operating agreements and well spacing orders. The question for determination is whether the applicable statutes and regulations govern "well spacing" as well as unit agreements.

In Sullivan, Handbook of Oil and Gas Law, 1955, in discussing state and federal control over conservation measures, the following statement appears at page 275: "Indian lands are subject to state conservation laws but orders of the conservation commission which affect them are not valid until approved by the Secretary of the Interior."

---

diction is to be determined by the allegations of the complaint and if the allegations of the complaint are made in good faith and the jurisdictional amount is properly pleaded, then the court's jurisdiction attaches when the complaint is filed and subsequent proceedings ordinarily will not divest the court of jurisdiction once attached."

6. Citing United States v. Cotton Valley Operators Committee, W.D.La.1948, 77 F.Supp. 409, defendants argue that there is no amount in controversy for the reason that oil and gas does not become property until reduced to possession at the surface. The law in Montana is otherwise. See Stokes v. Tutvet, 1958, 134 Mont. 250, 255, 328 P.2d 1096, 1099, where the court said: " * * * Mon-

tana is an ownership-in-place state with regard to oil, gas and other minerals. The general rule is that—"Both petroleum and gas, as long as they remain in the ground, are a part of the realty. They belong to the owner of the land, and are a part of it as long as they are on it or in it, or subject to his control. When they escape and go into other lands, or come under another's control, the title of the former owner is gone, and when produced on the surface they become personal property and belong to the owner of the well." ' "

7. The Fort Peck Indian Reservation was established by the Act of April 15, 1874, c. 96, 18 Stat. 28 and the Act of May 1, 1888, 25 Stat. 113.

It will be noted that 25 U.S.C. § 396d first provides that *"all operations* under any oil, gas, or other mineral lease * * *shall be subject to the rules and regulations* * * * * "*. (Emphasis added.) The second sentence provides that in the discretion of the Secretary leases may be made subject to unit plans. While this sentence was perhaps unnecessary in view of the all pervasive provisions of the first sentence, it seems clear that it was the intent of Congress to delineate further the powers of the Secretary rather than to limit them.

This is confirmed by reference to the regulations appearing in 30 CFR, Mineral Resources—Geological Survey. The definitions contained in § 221.2 include as (d) the following:

> "Officer in charge. The supervisor or such other officer as the Secretary may designate to supervise technical operations for the development and production of oil and gas on restricted Indian lands. Over such lands the officer so designated shall exercise the authority and power and perform the duties of supervisor as provided in the regulations in this part."

Section 221.11 reads:

> *"Well-spacing* and well-casing; technical assistance to lessees. The supervisor *shall approve well-spacing* and well-casing programs determined to be necessary for the proper development of the leases and assist and advise lessees in the planning and conduct of tests and experiments for the purpose of increasing the efficiency of operations." (Emphasis added.) [8]

Under section 3(g) of its leases, Calvert agreed "to abide by and conform to any and all regulations of the Secretary of the Interior now or hereinafter in force relative to such leases * * * ". This would include 30 CFR 221, as well as 25 CFR 171.21(b) (footnote 4).

It seems clear from these regulations that with respect to restricted Indian lands the approval of well spacing programs by the supervisor as the representative of the Secretary of the Interior is required. To argue that Congress has left to the states the determination of conservation practices, and particularly well spacing requirements, is to disregard the plain language of the regulations.

Plaintiffs' motion for summary judgment is granted. Plaintiffs will prepare, serve and lodge form of judgment pursuant to Rule 11(b) of the Local Rules of Court.

---

8. In oral argument counsel for defendants indicated that it was the practice to discuss spacing with the supervisor, but it was defendants' position that no formal action was required.