ASSINIBOINE AND SIOUX TRIBES OF the FORT PECK INDIAN RESERVATION, Plaintiffs-Appellants,

v.

The BOARD OF OIL AND GAS CONSERVATION OF the STATE OF MONTANA, et al., Defendants-Appellees.

No. 85–3573.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 10, 1985.

Decided June 17, 1986.

Marvin J. Sonosky, Kevin A. Griffin, Sonosky, Chambers & Sachse, Washington, D.C., for plaintiffs-appellants.

Blake A. Watson, Dirk D. Snel, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before SKOPIL, FLETCHER and WIGGINS, Circuit Judges.

FLETCHER, Circuit Judge:

The Assiniboine and Sioux Tribes of the Fort Peck Reservation appeal from the district court's order granting the Secretary of the Interior's motion to dismiss. The Tribes claim that the Secretary of the Interior unlawfully delegated his authority by entering into a Cooperative Agreement with the Board of Oil & Gas Conservation of the State of Montana. The district court dismissed the action, holding that there was no justiciable controversy. We reverse and remand for further proceedings.

## FACTUAL BACKGROUND

In November, 1983, the district court entered a judgment in *Assiniboine and Sioux Tribes v. Board of Oil and Gas Conservation,* Civ. No. CV–83–79–GF (D.Mont. Nov. 7, 1983), an action between the Tribes and the Board of Oil and Gas Conservation of the State of Montana (State Board). The court held that the Department of the Interior, and not the State Board, has jurisdiction over the spacing and location of oil and gas wells on lands the United States holds in trust for the Tribes or its individual members (Trust lands). The court enjoined the State Board from enforcing Order Number 19–83, which affected Trust lands. No appeal was taken.

The State Board regulates the oil and gas industry's discovery and development of mineral resources in Montana. *See Assiniboine and Sioux Tribes v. Calvert Exploration Co.,* 223 F.Supp. 909, 911 (D.Mont.1963) *rev'd on jurisdictional grounds sub nom. Yoder v. Assiniboine and Sioux Tribes,* 339 F.2d 360 (9th Cir. 1964). The Board establishes field rules governing oil and gas fields in Montana, including well spacing requirements, in part, to prevent unfair exploitation of mineral resources by operators extracting oil and gas from a given reservoir.

Often, surface rights over a reservoir are shared by several different owners, including the federal government, the Tribes, the state, and private landowners. Through careful well placement, the State Board presumably attempts to protect the rights of all surface owners and to ensure the fair development of resources.

When an applicant seeks an exemption from the rules, the State Board holds hearings to gather technical and other data. The Board then issues an order establishing guidelines for permissible well placement. The State Board's decision-making authority is restricted to drilling applications relating to non-federal and non-Indian lands.

One month after the district court's November 1983 judgment issued, the State Board held hearings and issued two "advisory orders" affecting well placement on Trust lands owned by individual tribal members. The State Board was acting pursuant to an informal arrangement with the Department of Interior, acting through the Montana office of the Bureau of Land Management (BLM). The BLM required the State Board to hear exemption applications submitted by Buckhorn Petroleum, Inc. and Anadarko Production Company as a prerequisite to considering their drilling requests. In its "advisory orders" the State Board admitted it had "no jurisdiction over said lands and that the jurisdiction over said lands is vested in the United States Department of Interior." The State Board indicated that it was hearing application requests and making recommendations

to the BLM. The BLM later approved the two drilling applications.[1]

In March 1984 the Tribes filed suit in federal district court under 28 U.S.C. § 1362 and 42 U.S.C. § 1983 naming the State Board and its members, the Secretary of the Interior (the Secretary), Anadarko Production Company, and Buckhorn Petroleum, Inc. as defendants. In their complaint, the Tribes objected to the proposed written "Cooperative Agreement," with its delegation of "powers of responsibility" to the State Board, and its retroactive ratification of existing State Board decisions. The Tribes sought injunctive relief (1) to prohibit the State Board from making any decisions or exercising any jurisdiction over Trust lands through the use of advisory opinions or other means, and (2) to prohibit the Secretary from delegating Interior Department trust oil and gas responsibilities to the State Board or requiring applicants to submit matters initially to the State Board. The Tribes also sought parallel declaratory judgments under 28 U.S.C. § 2201, and nullification of the Anadarko and Buckhorn advisory orders.

In June 1984, the BLM and State Board signed the Cooperative Agreement discussed in the Tribes' complaint, formalizing the advisory relationship. The relevant provisions are summarized as follows: applicants seeking permits related to Trust lands are required to submit the matter initially to the State Board. The State Board notifies the BLM of applications, enabling the BLM to present testimony or protest the application. In the event the BLM does protest, the State Board is required to either incorporate the BLM's objections or relinquish jurisdiction. Silence by the BLM "[is] considered as concurrence by the Montana BLM pending the approval of the authorized officer of the BLM." The State Board is required to notify the

BLM of "any disposition". According to the Agreement's terms, orders pertaining to Trust lands are not binding without signature of the BLM's authorized officer. Under the Agreement, the applicant must notify the Tribes of pending matters before the State Board that affect Trust lands. At an Indian landowner's request, the BLM must hold a pre-conference to discuss the application and any grievances. Finally, the Cooperative Agreement retroactively affirmed prior State Board decisions affecting Trust lands, by including a statement that "all existing decisions of the State Board involving Indian lands will remain in effect subject to the right of all parties to request that specific orders be reviewed. This shall also apply to those decisions not previously placed in effect on Indian lands or those recommended to the BLM for approval."

On June 28, 1984, the Secretary filed a motion to dismiss the Tribes' action for failure to state a claim. The Tribes moved in August 1984 for a preliminary injunction, asking the court to enjoin implementation of the Cooperative Agreement's procedures and nullify specific orders approved pursuant to the Agreement's provisions.

In August 1984, while the motion to dismiss was pending, the Tribes appealed the BLM's approval of the Cooperative Agreement, and its approval of an application relating to tribal Trust land, to the Interior Board of Land Appeals (IBLA). The IBLA constitutes the highest appeal level within the Department of the Interior on such matters.[2]

In November, 1984, the district court dismissed the action in its entirety, holding that there was no justiciable controversy. The court gave three reasons for this conclusion: (1) no final action affecting tribal interests had been taken by the Secretary; (2) the Secretary's action with respect to

1. The two applicants, Buckhorn Petroleum and Anadarko Production Company were originally defendants in this suit, but the Tribes did not challenge the district court ruling dismissing the complaint against them. The oil wells drilled following the BLM's approval of the Buckhorn

and Anadarko applications turned out to be dry, and were plugged and abandoned.

2. The Tribes apparently disputed whether the IBLA, rather than the Board of Indian Appeals or th Secretary of the Interior is the appropriate appeals body in this case.

the Cooperative Agreement was a matter committed to Agency discretion; and (3) the issues in the complaint were not ripe for review, because "the challenged action does not have an immediate impact on the Tribes, in that no irremedial adverse consequences have resulted from the action at issue." The district court further explained that adverse consequences from implementation of advisory orders could be appealed through Interior Department channels and later through court action. Although the district court dismissed for lack of a justiciable controversy, the court also discussed the merits. The court found that the Cooperative Agreement did not constitute an unlawful delegation of authority, because it "merely represents a means the Secretary has chosen to elucidate facts in an effort to render an informed decision."

After the Tribes timely appealed the district court's order to this court, the IBLA upheld both the Cooperative Agreement and a specific order affecting trust lands that the Tribes had appealed.

In March 1985 the Tribes filed a second suit in federal district court in the District of Columbia, challenging the Cooperative Agreement and its retroactive provisions. The Tribes requested relief similar to that requested in the Ninth Circuit suit. After the Secretary requested a stay of that action, pending the outcome of the proceedings here, the District of Columbia court dismissed the case without prejudice to reinstatement following this court's decision.

## DISCUSSION

### I. JUSTICIABILITY

The court below dismissed the Tribe's case as nonjusticiable. Justiciability is "not a legal concept with a fixed content or susceptible of scientific verification." *Poe v. Ullman*, 367 U.S. 497, 508, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961). The doctrine is a blend of constitutional limitations and prudential considerations, which are not easily distinguishable and "make the justiciability doctrine one of uncertain and shifting contours." *Flast v. Cohen*, 392 U.S.

83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). Concerns of justiciability most often touch upon "both the appropriateness of the issues for decision by courts and the hardship of denying judicial relief." *Joint Anti-Facist Refugee Committee v. McGrath*, 341 U.S. 123, 156, 71 S.Ct. 624, 640, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

The parties and the district court raised several interrelated issues that fall within one or more categories of justiciability: (1) whether the issues presented were ripe for review; (2) whether the Tribes should have exhausted their administrative remedies prior to filing suit; (3) whether the Secretary's acts constituted final agency action; (4) whether the matters presented were matters committed to agency discretion; and (5) whether the Tribes had standing to contest the issuance of advisory orders impacting lands owned by individual tribal members rather than the Tribes. We review de novo the district court's dismissal for lack of jurisdiction. *In re Castlerock Properties*, 781 F.2d 159, 161 (9th Cir. 1986).

Underlying each of these issues is the common concern whether it is the court that is the most appropriate institution to address the Tribes' claims at this particular time. *See* 13 C. Wright, A. Miller & E. Cooper *Federal Practice and Procedure* § 3529 at 288–93 (2d ed. 1984) (noting that often there is no reason to categorize justiciability issues when the concepts blend together and the court can simply make an overall evaluation of the appropriateness of judicial review). Therefore, although for clarity, we discuss these issues separately, we recognize that a flexible approach to justiciability, that is less concerned with specific categories, and more with underlying policies may be most useful. *See id.*

#### A. *Ripeness and Finality*

■ The ripeness doctrine prevents courts from deciding theoretical or abstract questions that do not yet have a concrete impact on the parties. *See Abbott Labora-*

*tories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967); *Southern California Edison Co. v. Federal Energy Regulatory Commission,* 770 F.2d 779, 785 (9th Cir.1985).

■ Because ripeness is "peculiarly a question of timing," we look at the facts as they exist today in evaluating whether the controversy before us is sufficiently concrete to warrant our intervention. *See Buckley v. Valeo,* 424 U.S. 1, 114–17, 96 S.Ct. 612, 680–81, 46 L.Ed.2d 659 (1976); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 139–40, 95 S.Ct. 335, 356–57, 42 L.Ed.2d 320 (1974).[3]

In this case, several months before the district court rendered its decision, the BLM and the State Board signed the Cooperative Agreement and its procedures went into effect. The Agreement retroactively approved existing State Board decisions or recommendations impacting Indian lands. Shortly after the Agreement was signed, the State Board held hearings on well spacing and location for fields involving tribal Trust land. Pursuant to this process, the BLM approved for applicability to Trust lands the spacing rules that the State Board had promulgated in Order No. 19–83, the order earlier contested by the

Tribes in the 1983 district court action between the Tribes and the State Board.[4]

The question before us is whether the issue of the validity of the Cooperative Agreement's procedure is ripe for review.

■ The ripeness inquiry has two prongs: fitness of the issue for judicial decision and hardship to the parties if court review is withheld. *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515; *Johnson v. Stuart,* 702 F.2d 193, 196 (9th Cir.1983).

■ At the time of the district court's consideration, the Cooperative Agreement had been placed in operation. It governed the application approval process, and under its aegis the BLM had approved advisory orders affecting tribal lands. The district court was presented with a controversy that was "definite and concrete, not hypothetical or abstract." *Babbitt v. United Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (quoting *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945)).

Because the district court had a concrete basis on which to render a decision, *see Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 166–67, 87 S.Ct. 1520, 1525–26, 18 L.Ed.2d 697 (1967), the court could evaluate the Tribes' contention that the BLM's del-

---

**3.** In *Buckley v. Valeo,* the Supreme Court reversed the Court of Appeals's decision that the constitutionality of certain aspects of the Federal Election Commission's as yet unexercised authority was not ripe for adjudication. The Court noted that in the interim between the Court of Appeals's decision and Supreme Court's consideration of the case, the Commission had in fact exercised its authority, or at least the date of its exercise was closer. The Court therefore found the issue ripe for review. *Buckley v. Valeo,* 424 U.S. at 116–17, 96 S.Ct. at 681.

Similarly, in the *Regional Rail Reorganization Act Cases,* the Supreme Court reversed the lower court's holding that provisions of the Rail Act were not ripe for review. The Court thought it highly significant that circumstances had changed since the time of the district court's ruling. "Whatever may have been the case at the time of the district court decision, there can be little doubt ... that some of the 'conveyance taking' issues can and must be decided at this time ... [i]t is the situation now, rather than the situation at the time of the district court's deci-

sion that must govern." 419 U.S. at 140, 95 S.Ct. at 356 (footnote omitted).

**4.** The district court queried, without deciding, whether the Tribes have standing to raise the claims presented. The basis for the district court's concern was its characterization of this suit as limited to questions concerning the Anadarko and Buckhorn advisory orders. Those two orders affected land owned by individual allottees, rather than by the Tribes themselves. Furthermore, the wells drilled pursuant to those advisory orders had been found dry and had been plugged, thus rendering moot the Tribes' request that those advisory orders be voided.

However, while the Tribes did request relief relating to these two orders, it is clear that their complaint stated other claims as well. *See supra.* Because the Tribes contested not just these two advisory orders, but the Cooperative Agreement itself and all orders approved under its provisions, we need not reach the standing and mootness issue raised by the district court and the Secretary.

egation of authority constituted a complete abdication of responsibility because the BLM in reality "rubber stamped" State Board actions. This distinguishes the Tribes' case from others in which a specific factual context was necessary, but lacking. *See Western Mining Council v. Watt*, 643 F.2d 618, 627 (9th Cir.) ("the mere possibility that the Secretary may act in an arguably unconstitutional manner pursuant to one or more of these statutes is insufficient to establish the 'real and substantial controversy' required to render a case justiciable under Article III"), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Council of Southern Mountains, Inc. v. Donovan*, 516 F.Supp. 955, 960 (D.D.C.1981) (case not ripe because claim that Secretary of Labor had not issued enough citations was impossible to resolve in the abstract). This question was therefore clearly fit for judicial decision.

However, even without specific advisory orders to review, the district court was still in a position to decide the merits of the Tribe's contention that by authorizing the State Board to engage in fact-finding and draw initial conclusions, the Secretary had abdicated a critical part of his responsibilities.

■ We look to the standards set forth in *Abbott Laboratories* for challenges to administrative actions that have been promulgated but not yet enforced to determine whether this issue is reviewable. Review is not premature if the agency action is final, and is "purely legal." *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515. Alternatively, if factual determinations are involved review is appropriate if further factual development would not render the issue more concrete. *Western Oil and Gas Ass'n v. United States Environmental Protection Agency*, 633 F.2d 803, 807 (9th Cir.1980).

■ Finality is a pragmatic, flexible concept. *See Abbott Laboratories*, 387 U.S. at 150–52, 87 S.Ct. at 1516–17. The court examines whether the action represents a definitive statement of the agency, has direct and immediate effects on the plain-

tiff's day to day business, has the status of law, whether immediate compliance with its terms is expected, and whether court review will interfere with the proper functioning of an agency. *Federal Trade Commission v. Standard Oil Co.*, 449 U.S. 232, 239–43, 101 S.Ct. 488, 493–95, 66 L.Ed.2d 416 (1980); *Air California v. United States Department of Transportation*, 654 F.2d 616, 620–21 (9th Cir.1981).

In this case, the Tribes and applicants for BLM approval of mining activities were expected to comply with the Cooperative Agreement's provisions. The Agreement did not represent a tentative position on the part of the BLM. It was therefore "final" action under *Abbott Laboratories*.

The question of whether the BLM's relinquishment of initial fact-finding and decision-making responsibilities constitutes an illegal delegation is primarily legal; and a specific factual context would not aid the court. The issue presented for review here is similar to that presented in *Federal/Postal/Retiree Coalition A.F.G.E. v. Devine*, 751 F.2d 1424 (D.C.1985). In that case, labor organizations challenged the legality of the Office of Personnel Management's (OPM) proposal to publish guidelines for dissemination to administrative agencies on the topic of labor-management relations. The organizations contended that the Civil Service Reform Act (CSRA) vested exclusive responsibility in the Federal Labor Relations Authority (FLRA) to provide policy guidelines to other agencies in this area, and therefore that OPM had exceeded its authority. At the time of suit, OPM had not promulgated the guidelines, but had merely published in the Federal Register its notice of intention to publish such a manual in the future.

The District of Columbia Circuit held that the issue was ripe for review under the *Abbott Laboratories* formulation. According to the court, whether OPM had authority to publish guidelines along the lines described "squarely presented for resolution the legal issue 'whether OPM has authority to issue the policy guidance as a whole.' " *Id.* at 1426. Similarly, the issue

presented here is a purely legal question: whether the BLM could relinquish to the State Board any aspect of its authority to review applications and make determinations on matters in which the BLM admittedly has exclusive jurisdiction, thereby forcing parties to submit matters to the State Board.[5] *See also Babbitt,* 442 U.S. at 297–301, 99 S.Ct. at 2308–10 (constitutional challenge to statutory election procedures justiciable even though plaintiffs had not yet invoked those procedures; no factual record required); *Johnson,* 702 F.2d at 196 (constitutional challenge to textbook screening procedure ripe for review); *Pacific Legal Foundation v. State Energy Resources Conservation & Development Commission,* 659 F.2d 903, 917 (9th Cir. 1981) (statutory requirement that utility include three alternate sites in notice of intention, ripe for review; no need to delay adjudication until a utility actually submits a notice containing fewer than three sites, given the patent inevitability of the operation of the statute against certain individuals); *State of Arizona v. Atchison, Topeka and Santa Fe R.R.,* 656 F.2d 398, 402–03 (9th Cir.1981) (challenge to statute made six months before statute's effective date ripe for review; position of parties clear and operation of statute against parties inevitable); *Nance v. Environmental Protection Agency,* 645 F.2d 701, 713 (9th Cir.) (holding that the issue of the EPA's authority to delegate air quality decisions to Indian tribes was ripe for review), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); *American Motorcyclist Ass'n. v. Watt,* 543 F.Supp. 789, 793–94 (C.D.Cal. 1982) (plaintiffs' challenge to BLM's motorized vehicle route selection criteria ripe, even if criteria had not yet been applied). We find the question of the Cooperative Agreement's delegation of fact-finding to the State Board is fit for judicial decision.

The requirements of the second prong of the ripeness test—hardship to the parties— is also met in this case. Existence of the Cooperative Agreement forces the Tribes to alter their behavior in significant ways.

The Tribes may no longer deal directly and solely with the BLM, their trustee. Instead, the Tribes must initially appear before the State Board to make their views known, or else risk having the Board make recommendations or decisions without benefit of the Tribes' input. The Tribes also argue that application of State Board orders to tribal land creates additional hardships because they must appeal objectionable orders, while in the interim, drilling on adjacent non-Tribal lands may drain mineral resources from shared reservoirs. *See Gardner,* 387 U.S. at 164–65, 87 S.Ct. at 1524–25 (distinguishing between cases in which serious consequences follow from delaying challenge to an administrative regulation and cases in which the consequences are minor); *American Motorcyclist Ass'n.,* 543 F.Supp. at 794 (hardship created by threat of potentially irreparable environmental harm.)

Therefore, because the Tribes' claims are fit for judicial decision, and because it would impose significant burdens on the Tribes if review were delayed, we find that the issues raised are ripe for review.

B. *Exhaustion of Administrative Remedies*

■ The decision whether to require exhaustion of administrative remedies is within the district court's discretion, unless exhaustion is statutorily mandated. *Rodrigues v. Donovan,* 769 F.2d 1344, 1348 (9th Cir.1985); *Montgomery v. Rumsfeld,* 572 F.2d 250, 252 (9th Cir.1978).

■ In the present posture of this case, we need not dwell upon the exhaustion issue, since, in fact, exhaustion has occurred. *See Rodrigues,* 769 F.2d at 1349 (if district court dismissed action for failure to exhaust administrative remedies, and remedies are then exhausted pending appeal, case should then go forward in district court); *Montgomery,* 572 F.2d at 254 (on appeal, parties informed the court that appellants had exhausted their appeals to

---

5. It is curious that the district court found this issue sufficiently concrete that he offered his

opinion on its merits; while simultaneously dismissing the action as not yet ripe for review.

the Army Board for the Correction of Military Records; if so, then the exhaustion issue had been rendered moot.)

This result is consistent with the policies underlying the exhaustion requirement: that courts should not prematurely interfere with agency processes; that agencies should have an opportunity to correct their mistakes; and that the reviewing court benefits from an agency's application of its expertise to the problem at hand, as well as from the development of an adequate factual record. Since the administrative remedies have been exhausted here, these considerations have been fully met.[6]

## C. *Action Committed to Agency Discretion*

██ A right to judicial review of agency action is presumed unless a statute precludes review or the action is one committed to agency discretion. *See Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985); *Abbott Laboratories*, 387 U.S. at 140, 87 S.Ct. at 1510. The Administrative Procedure Act, 5 U.S.C. § 701(a) codifies this test of reviewability.[7]

The "committed to agency discretion" exception to the presumption of reviewability applies in those very limited circumstances in which Congress has drafted a statute so that the courts have "no meaningful standard" against which to judge the agency's exercise of discretion. *Chaney*, 105 S.Ct. at 1655; *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

The district court in this case based its holding that the Tribes' claims were not justiciable in part on its conclusion that the Secretary's actions were committed to agency discretion. The district court failed to disclose the basis for this conclusion, however. Given the nature of the Tribes' claim, we are unpersuaded that review is inappropriate. At issue in this case is whether the Secretary is free to delegate to the State Board any aspect of the authority that Congress deliberately and specifically vested in him.[8] Courts have widely held that claims that an agency has acted outside its statutory authority are reviewable even though its decision on the merits might be unreviewable as committed to

---

**6.** It is unclear from the district court's order whether exhaustion, in addition to ripeness, was a partial basis for the court's holding. The parties raised this issue on appeal, and we dispose of it here.

**7.** § 701 Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that

(1) Statutes preclude judicial review; or

(2) Agency action is committed to agency discretion by law.

**8.** 25 U.S.C. §§ 396–396g governs the leasing of Indian lands for mining purposes. These sections authorize the Secretary of Interior to make rules and regulations necessary to carry out the provisions of the statutes.

Section 396 provides in part:

All lands allotted to Indians in severalty, ... may by said allottee be leased for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior; and the Secretary of the Interior is authorized to perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section into full force and effect.

Section 396a provides:

[u]nallotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction, except those specifically excepted from the provisions of sections 396a to 396g of this title, may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities.

Section 396d provides:

All operations under any oil, gas, or other mineral lease issued pursuant to the terms of sections 396a to 396g of this title or any other Act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior. In the discretion of the said Secretary, any lease for oil and gas issued under the provisions of sections 396a to 396g of this title shall be made subject to the terms of any reasonable cooperative unit or other plan approved or prescribed by said Secretary prior or subsequent to the issuance of any such lease which involves the development of production of oil or gas from land covered by such lease.

agency discretion.[9] *See Leedom v. Kyne,* 358 U.S. 184, 190, 79 S.Ct. 180, 184, 3 L.Ed.2d 210 (1958) (court will not infer that Congress did not intend courts to protect parties against agency action taken in excess of delegated powers); *Johnson Oyster Co. v. Baldridge,* 704 F.2d 1060, 1062 (9th Cir.1983) (court could review allegation that Secretary of Commerce violated departmental regulation); *Hondros v. United States Civil Service Comm'n.,* 720 F.2d 278, 293 (3d Cir.1983) (agency actions otherwise "committed to agency discretion by law" are reviewable to determine whether decision violates constitution, statute, or regulation). *See also Nader v. Civil Aeronautics Board,* 657 F.2d 453, 456 (D.C.Cir. 1981) (where claim is that adoption of rule violated statutory directives, non-reviewability doctrine was "simply inapplicable"); *Matzke v. Block,* 564 F.Supp. 1157, 1161 (D.Kan.1983) (issue of the procedures followed by the agency is separate from the issue whether the agency's ultimate decision on the merits is reviewable) *aff'd in part, rev'd in part* 732 F.2d 799 (10th Cir.1984); *Owens v. Hills,* 450 F.Supp. 218, 221 (N.D.Ill.1978) (although statute precluded review of agency decision, concepts of "separation of powers" and "unlawful delegation of legislative power" mandated review to determine whether agency violated its statutory authority); Saferstein, *Non Reviewability: A Functional Analysis of "Committed to Agency Discretion"* 82 Harv.L.Rev. 370 (1968).

 Hence, the Tribes' claim that the Secretary exceeded his statutory authority and breached congressionally-imposed fiduciary duties by negotiating a Cooperative Agreement that transferred responsibilities to the State Board is clearly reviewable by this court.

## II. SOVEREIGN IMMUNITY

 Unless it consents, the United States, as sovereign, cannot be sued. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Sovereign immunity bars both equitable and legal claims against the United States, unless waived or inapplicable. *Beller v. Middendorf,* 632 F.2d 788, 796 (9th Cir. 1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981).

 Even though the suit is against a federal agency or officer acting in his official capacity, as is the case here, we must still determine whether sovereign immunity has been waived. *See Rowe v. United States,* 633 F.2d 799, 800 (9th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981).

 The Secretary is correct that 28 U.S.C. § 1362, the jurisdictional provision under which the Tribes brought suit does not waive sovereign immunity.[10] *See Scholder v. United States,* 428 F.2d 1123, 1125 (9th Cir.), *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970).

Although the Secretary concedes in his brief that the Administrative Procedure

---

**9.** Other circuits have found the Secretary's actions in this context to be reviewable. *See Jicarilla Apache Tribe v. Supron Energy Corp.,* 728 F.2d 1555, 1563 (10th Cir.1984) (Seymour, J., concurring in part and dissenting in part), *dissenting opinion adopted as the majority opinion as modified,* 782 F.2d 855 (10th Cir.1986) (en banc); *Kenai Oil and Gas, Inc. v. Department of Interior,* 671 F.2d 383, 386 (10th Cir.1982) (reversing the district court's holding that the Secretary's decision to approve or disapprove communitization agreements under 25 U.S.C. §§ 396a–396g is committed to agency discretion, since the Secretary's actions could be measured against the limits imposed on the Secretary as the Indians' fiduciary).

The Tenth Circuit appears to impose a stricter standard when reviewing the Secretary's administrative actions, when the Secretary acts as tribal trustee. *See Jicarilla,* 728 F.2d at 1566–67 (it is error to use administrative law analysis without considering role that the Secretary's position as fiduciary should play in judicial review of his administrative actions).

**10.** Section 1362 states:
The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws or treaties of the United States.

Act does waive sovereign immunity,[11] he implies that the Tribe's failure to plead the APA as a jurisdictional basis should preclude us from entertaining the Tribe's action.

■ The Administrative Procedure Act does *not* provide an independent basis of jurisdiction to review agency actions. *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). Whether section 702 of the APA waives sovereign immunity for actions brought under federal question statutes is a different question.

This court has held that section 702 does waive sovereign immunity in non-statutory review actions for non-monetary relief brought under 28 U.S.C. § 1331. *See, e.g., Rowe,* 633 F.2d at 801 (district court held that it had jurisdiction to review Secretary of Interior's decision not to award leases to plaintiff in action brought under § 1331; APA waives sovereign immunity); *Middendorf,* 632 F.2d at 796–97 & n. 4 (holding that section 702 waives sovereign immunity in action against Secretary of the Navy under section 1331, and therefore finding it unnecessary to decide whether the doctrine was inapplicable on grounds that the official's actions violated the Constitution); *see also* 4 K. Davis *Administrative Law Treatise* § 23:19 at 195 (2d ed. 1983) ("[A]bolition of sovereign immunity in § 702 is not limited to suits 'under the Administrative Procedure Act'; the abolition applies to every 'action in a court of the United States seeking relief other than money damages ... No words of § 702 and no words of the

legislative history provides any restriction to suits 'under' the APA."); *Jaffee v. United States,* 592 F.2d 712, 718 (3d Cir.) (sovereign immunity waived in suit brought under § 1331 to require United States to warn soldiers who had been exposed to radiation of the medical risks), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979).

■ We see no reason to distinguish between this court's prior holdings governing suits brought under section 1331, and a suit brought under section 1362.[12] *See* F. Cohen, *Handbook of Federal Indian Law* 225 n. 4 (1982) Thus, we hold that 5 U.S.C. § 702 waives the defense of sovereign immunity in this action.

## III. UNLAWFUL DELEGATION OF AUTHORITY

The district court reviewed the Cooperative Agreement and concluded that it involved no unlawful delegation of authority.[13] The court based its opinion on the Agreement's language that all Board decisions require BLM approval, from which the court concluded that the State Board acts only in a fact-gathering or advisory capacity.

The Tribes assert that the BLM's retention, under the Agreement, of the right to approve is "in name" only; that it allows the BLM unlawfully to "rubber-stamp" State Board decisions; and that, in fact, the BLM has proceeded to act as a rubber stamp. The Tribes further contend that

11. The Administrative Procedure Act, 5 U.S.C. § 702 provides in part:
> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in any official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

12. The purpose of section 1362 was to give district courts jurisdiction over actions that could have been brought by the United States as trustee, but which "for whatever reason, were not so brought." *Moe v. Confederated Salish and Koo-*

*tenai Tribes,* 425 U.S. 463, 472, 96 S.Ct. 1634, 1641, 48 L.Ed.2d 96 (1976). In addition, the section was passed to ensure jurisdiction would exist even though the then-existent amount in controversy requirement had not been met. *See United States v. Alpine Land & Reservoir Co.,* 431 F.2d 763, 767 (9th Cir.1970), *cert. denied,* 401 U.S. 909, 91 S.Ct. 869, 27 L.Ed.2d 807 (1971).

13. Although the district court expressly dismissed the action for lack of a justiciable controversy, in view of our holding that a justiciable controversy exists, we treat the district court's discussion of the merits as the district court's alternative ruling on the Secretary's Fed. R.Civ.P. 12(b)(6) motion.

even if the BLM were to exercise independent review over State Board actions, the initial fact-gathering and decision-making responsibilities performed by the State Board are critical parts of the BLM's functions that lawfully cannot be delegated to an entity that admittedly has no jurisdiction.[14]

We review de novo the district court's dismissal, for failure to state a claim. *Dooley v. Reiss*, 736 F.2d 1392, 1394 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984). For purposes of evaluating a motion to dismiss, we treat the allegations stated in the complaint as true. *Id.* at 1393. The complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 1394 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

▪ The Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396a–396g, is a detailed and comprehensive act that imposes extensive responsibilities on the government in tribal mineral leasing matters for the benefit of Indians. *See Blackfeet Tribe of Indians v. Montana*, 729 F.2d 1192, 1199 & n. 18 (9th Cir.1984) (en banc), *aff'd*, —— U.S. ——, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985); *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1564–65 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in part), *dissenting opinion adopted as the majority opinion as modified*, 782 F.2d 855 (10th Cir.1986) (en banc). Taking into account these specific, congressionally-imposed duties, and the long-standing, general trust relationship between the government and the Indians, we conclude that a fiduciary relationship

exists in the management of tribal mineral resources.[15] *See Jicarilla*, 728 F.2d at 1563–65 (statutes and regulations contain such explicit duties that it is clear Congress intended Secretary to act as trustee in managing leases for the Indians); *cf. United States v. Mitchell*, 463 U.S. 206, 224–26, 103 S.Ct. 2961, 2971–73, 77 L.Ed.2d 580 (1983) (statutes establish fiduciary duty in the management of Indian timber resources).

▪ The United States, as the Tribes' fiduciary, is held to strict standards and is required to exercise the greatest care in administering its trust obligations. *See Mitchell*, 463 U.S. at 225–28, 103 S.Ct. at 2972–74; *United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973); *Nance*, 645 F.2d at 710; F. Cohen, *Handbook of Federal Indian Law* 225–26 (1982 ed.).

▪ Courts judging the actions of federal officials taken pursuant to their trust relationships with the Indians therefore should apply the same trust principles that govern the conduct of private fiduciaries. *See Mitchell*, 463 U.S. at 226, 103 S.Ct. at 2972; *Seminole Nation v. United States*, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942); *American Indians Residing on Maricopa–AK Chin Reservation v. United States*, 667 F.2d 980, 990, 229 Ct.Cl. 167 (1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).

Accepting as true the Tribes' allegations that the Secretary conducts no independent review of the applications, we find it impossible to reconcile this alleged rote approval of State Board orders with the strict standard of conduct expected of a trustee.[16] *See In re Johnson*, 518 F.2d 246, 253 (10th

---

14. In their brief, the Tribes dispute the district court's conclusion that BLM approval is in fact required in all circumstances. The Tribes state that under the Agreement, the BLM's failure to act would "mak[e] the State Board action the last word."

15. Neither the Tribes nor the Secretary dispute the existence of a trust relationship; we merely emphasize its significance to our determination.

16. Specifically, the Tribes alleged in their motion and memorandum in support of a preliminary injunction that the BLM has no meaningful administrative record before it at the time it renders a decision, and that State Board orders are approved en mass, without adequate scrutiny. The Tribes contend that the State Board prepares no formal administrative record and uses no reliable hearing transcription mechanism. The Tribes contend that the State Board

Cir.), *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975) (trustee may not delegate duties for which he is responsible); *Restatement (Second) of Trusts* § 171 at 373–74 (1954). Therefore, if at trial, the Tribes could prove that the Cooperative Agreement has resulted in BLM approval of State Board orders without meaningful independent review, then its procedures would constitute an unlawful delegation of authority. *Cf. Save our Wetlands v. Sands,* 711 F.2d 634, 641–43 (5th Cir.1983) (construing the requirements imposed upon agencies under the National Environmental Policy Act to consider environmental consequences of their actions and holding that an agency does not satisfy those requirements if it "reflexively rubber-stamps" reports prepared by others); *Sierra Club v. Lynn,* 502 F.2d 43, 59 (5th Cir.1974), *cert. denied,* 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975) (public or private entities may participate in preparation of environmental impact reports, as long as federal agency does not abdicate responsibilities and rubberstamp their work product); *Friends of Endangered Species, Inc. v. Jantzen,* 589 F.Supp. 113, 118–19 (N.D.Cal. 1984), *aff'd,* 760 F.2d 976 (9th Cir.1985) (federal agency's delegation of environmental research to a third party is impermissible if agency fails to adequately review the work).

Moreover, on its face, the Cooperative Agreement raises grave questions concerning whether the State Board's responsibilities under its terms directly conflict with the Secretary's fiduciary obligations.

There is an obvious need for cooperation between adjacent landowners in resource development. *See, e.g.,* 25 C.F.R. § 211.21 (1985) (tribal leases are subject to Secretary's restrictions; Secretary may "take into consideration, among other things, the Federal laws, state laws, regulations by competent Federal or State authorities, lawful agreements among operators regulating either drilling or production, or both, and any regulatory action desired by tribal authorities."). Thus, it is without question sound practice for the BLM in its delibera-

tions, to be aware of the spacing and location requirements established by the State Board. We do not suggest that cooperation, including possibly limited subdelegation by the Secretary to the State Board of nondiscretionary activities such as compiling, hearing, and transmitting technical information might not be permissible and desirable.

Courts have previously held that subdelegation of administrative responsibilities to other sovereign entities is not per se improper. *See, e.g., United States v. Mazurie,* 419 U.S. 544, 556–57, 95 S.Ct. 710, 717–18, 42 L.Ed.2d 706 (1975) (Congress could delegate its regulatory power over sales of alcoholic beverages in Indian territory to Indian tribes); *Southern Pacific Transportation Co. v. Watt,* 700 F.2d 550, 556 (9th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 393, 78 L.Ed.2d 336 (1983) (Secretary of the Interior could subdelegate aspects of its authority over granting railroad right-of-ways across Indian lands to the Tribe); *United States v. Matherson,* 367 F.Supp. 779, 781–84 (E.D.N.Y.1973) (Secretary of Interior could require persons seeking motor vehicle permits to first obtain a permit from local municipality), *aff'd* 493 F.2d 1399 (2d Cir.1974).

However, critical distinctions between these subdelegation cases and the Tribes' case exist. Subdelegations to a sovereign tribe permitting the tribe some measure of added control over its own lands, *Mazurie,* 419 U.S. at 556–57, 95 S.Ct. at 717–18; *Southern Pacific,* 700 F.2d at 556, differs from a subdelegation to an entity that has no independent jurisdiction, *see Matherson,* 367 F.Supp. at 783. Limitations on delegation are "less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." *Mazurie,* 419 U.S. at 556–57, 95 S.Ct. at 717–18; *Southern Pacific,* 700 F.2d at 556.

▇▇▇▇▇ Without express congressional authorization for a subdelegation, we must look to the purpose of the statute to set its parameters. *Rodriguez v. Compass Shipping Co.,* 617 F.2d 955, 959 (2d Cir.1980)

has assumed de facto jurisdiction over applica- tions as a result.

*aff'd,* 451 U.S. 596, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981). Here, we deal with a statutory and regulatory scheme enacted with a threefold purpose in mind: to achieve uniformity in tribal leasing matters; to increase Indian authority in granting leases; and to protect the Indians' economic return on their property. *See Blackfeet Tribe,* 729 F.2d at 1199; *Jicarilla,* 728 F.2d at 1565. To achieve these purposes, Congress deliberately entrusted the Secretary with comprehensive responsibilities. *Jicarilla,* 728 F.2d at 1565.

We are reluctant to read broad authority to subdelegate into these statutes, absent clear proof of legislative intent to relieve the Secretary of a portion of his duties and proof that such a delegation would be in the Tribe's best interests.[17] *See Montana v. Blackfeet Tribe,* 105 S.Ct. 2399, 2403–04 (1985) (statutes are to be construed liberally in Indians' favor, with ambiguities interpreted to their benefit). Therefore, the Secretary's role as fidicuary, the Board's clear lack of jurisdiction over tribal leases,

and the legislative silence about subdelegation all counsel in favor of very limited delegation of responsibilities in these circumstances.

In its order, the district court agreed that sections of the Agreement that govern procedures relating to State Board review of applications were "poorly drafted and ... ambiguous." Nonetheless, the court concluded that the Agreement did not transfer any final authority to the State Board, but merely "utiliz[ed] a state hearings mechanism to elucidate facts...."

We cannot agree that the delineation of responsibilities is so plainly set forth on the face of the Agreement that the district court could rule unequivocally that the Tribes had stated no possible claim for relief.[18] The Agreement's terms can easily be read to delegate to the State Board power to decide tribal lease issues, without the BLM's active intervention. The alternative interpretation suggested by the Secretary and adopted by the district court, i.e., that the use of the State Board hearing

---

**17.** We must be particularly cautious about returning responsibilities to the State Board, given the earlier court decisions that removed all jurisdiction from it.

**18.** The Agreement states, in relevant part:

III. B. *Procedural Format*

It is agreed that all matters which would require State Board approval (whether administrative or entire Board) if non-federal minerals were involved, shall initially be submitted to the State Board even if federal and/or Indian minerals are partially or entirely involved. Such matters shall be heard and decided by the State subject to the conditions set forth in subsections (1), (2), (3), and (4), below, unless the BLM shall, prior to the hearing on any matter, require that the State Board decline to hear the matter and, instead, refer it to the BLM for decision.

\* \* \* \* \* \*

(2) *Indian Land*

The State Board shall furnish Montana BLM with notices of all requests for hearings which in any manner relate to or involve Indian trust or restricted lands. The Montana BLM shall be entitled to present expert testimony with respect to such determinations and hearings, and shall be informed in writing of any disposition.

If the Montana BLM should desire to protest any requested determination, it shall do so by written protest delivered to the Board

prior to the hearing or by appearance at the hearing. Any such protest shall specify the BLM objections and the conditions, if any, under which the BLM will accept the relief requested. Failure to object to any determination, and failure to appear and protest (either by witness or in writing) at any hearing shall be construed as concurrence by the Montana BLM pending the approval of the authorized officer of the BLM. The Board shall either issue its order incorporating the conditions of the protest or shall relinquish jurisdiction to the BLM over the matter insofar as it relates to Indian land.

Consistent with the terms of this agreement, all existing decisions of the State Board involving Indian lands will remain in effect subject to the right of all parties to request that specific orders be reviewed. This shall also apply to those decisions not previously placed in effect on Indian lands or those recommended to the BLM for approval.

If requested, the BLM shall provide a preconference to any Indian owner or their representative prior to a regularly scheduled hearing if Indian lands may be affected by a Board decision. Any Indian owner or their representative may also be present and offer testimony or evidence at any hearing (or with respect to any determination) involving the Indian owner's land. Notices of all hearings and determinations affecting Indian lands shall be given by the

mechanism merely serves as a convenient means to accumulate necessary facts, is possible. An examination of the four corners of the Agreement is inconclusive and contradictory.

The district court erred in deciding this question on a motion to dismiss, without first taking evidence to ascertain the true scope of the subdelegation. The Tribes should have been permitted the opportunity to prove their claim that the Agreement on its face, and in operation constitutes an unlawful delegation of the Secretary's trust obligations. The district court's judgment is REVERSED and REMANDED.

applicant to the Indian owners at the address provided by the Indian Agency having jurisdiction over the land.

\* \* \* \* \* \*

VI. *Jurisdiction of State Board*

In the event any matter is submitted to the State Board for decision or other order and the BLM does not either require the State Board to decline to hear and decide the matter, or does not object to the State Board order as provided in Section B, above, the State Board shall be deemed to possess the necessary jurisdiction to bind all federal interests jointly with any non-federal interests. Such jurisdiction shall be the result of the State Board acting as the agent of the Montana BLM in exercising its responsibilities with respect to federal land in a spirit of cooperation with the State Board.

This jurisdiction shall not apply to Indian lands. Future decisions or other orders involving Indian lands shall only be binding upon the signature of the Authorized Officer of the BLM.