WESTERN SHOSHONE NATIONAL COUNCIL; Joe Kennedy; John Wells; Pauline Esteves; and Kevin Gillette, Plaintiffs,

v.

UNITED STATES of America; Samuel W. Bodman, Secretary of the United States Department of Energy; and Gale Norton, Secretary of the United States Department of the Interior, Defendants.

No. 5–05–0290–PMP LRL.

United States District Court,
D. Nevada.

Nov. 1, 2005.

Order Denying Reconsideration
Dec. 20, 2005.

Robert R. Hager, Hager & Hearne, Treva J. Hearne, Hager & Hearne, Reno, NV, for Pauline Esteves, Kevin Gillette, Joe Kennedy, John Wells, Western Shoshone National Council, Plaintiffs.

Blaine T Welsh, U.S. Attorney's Office, Las Vegas, NV, Kelly A. Johnson, U.S. DOJ, Washington, DC, for Samuel W. Bodman, Gale Norton, Kinder–Morgan Energy Partners, Defendants.

Indigenous Law Institute, Steven T. Newcomb, Eugene, OR, Pro Se.

Peter d'Errico, pro hac vice, Leverett, MA.

*ORDER*

PRO, Chief Judge.

Presently before this Court is Defendants' Motion to Dismiss (Doc. # 16), filed on May 16, 2005. Plaintiffs filed an Opposition to Motion to Dismiss (Doc. # 23) on July 6, 2005. Defendants filed Points and Authorities in Support of Defendants' Reply to Plaintiffs' Response to Defendants' Motion to Dismiss (Doc. # 26) on August 5, 2005. For the reasons set forth below, the Court finds that Defendants' Motion to Dismiss must be granted.

## I. BACKGROUND

Plaintiffs are the Western Shoshone National Council and four individual Western Shoshones. (Compl. [Doc. # 1] at ¶¶ 2–3.) According to Plaintiffs, the Western Shoshone National Council is the modern governmental structure of the Western Shoshone government that has existed since time immemorial. (Pls.' Reply in Supp. of Mot. for Prelim. Inj., Ex. 5, Aff. of Raymond Yowell at ¶¶ 1–4.) The Western Shoshone Indians have lived in the southwestern United States since before white settlement in the area. (Compl. ¶¶ 7–9.) The Western Shoshone homeland covered approximately sixty million square miles in Nevada, California, Idaho, and Utah. (*Id.* ¶ 12.)

In 1863, the Western Bands of the Shoshone Nation entered into a treaty with the United States known as the Treaty of Ruby Valley, 18 Stat. 689 (Ratified June 26, 1886). (Compl.¶ 13, Ex. 1.) The Treaty called for cessation of hostilities and attacks upon United States citizens, trains, and mail and telegraph lines. (Compl., Ex. 1, art. 1.) The Treaty provided that "[t]he several routes of travel through the Shoshone country, now or hereafter used by white men, shall be forever free, and unobstructed by the said bands, for the use of the government of the United States, and of all emigrants and travellers under its authority and protection ...." (*Id.*, art. 2.)

Additionally, the Treaty set forth activities for which the parties agreed the United States and its citizens could use the land. These included: establishing military posts; erecting and occupying station houses for travelers and the mail and telegraph lines; establishing and operating telegraph and overland stage lines; locating, constructing, and operating a rail line from the plains to the Pacific Ocean; exploring, prospecting, and mining for gold, silver, and other minerals; forming mining and agricultural settlements and ranches; and erecting timber mills and taking timber. (*Id.*, arts. 2–4.) The United States agreed to compensate the Shoshone tribes for "the inconvenience resulting to the Indians in consequence of the driving away and destruction of game along the routes travelled by white men, and by the formation of agricultural and mining settlements," by paying the bands a five thousand dollar annuity for twenty years. (*Id.*, art. 7.) The Treaty covered the lands including Yucca Mountain located in Nevada. (Compl. ¶ 7; Compl., Ex. 1, Art. 5.)

Over one hundred years later, the United States has selected Yucca Mountain as a proposed site for a repository for high-level nuclear waste. In 1982, Congress enacted the Nuclear Waste Policy Act ("NWPA"). Pub.L. No. 97–425, 96 Stat. 2201 (1982) (codified as amended at 42 U.S.C. §§ 10101–10270). The NWPA required the federal government to assume responsibility for permanently disposing the nation's nuclear waste and, to that end, set forth procedures for the selection and operation of geologic repositories. *Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1258–61 (D.C.Cir.2004).

The Act assigned to the Department of Energy ("DOE") the tasks of selecting, designing, and operating a nuclear waste

repository. 42 U.S.C. §§ 10132–34. As the NWPA originally was enacted, the site selection process required the DOE Secretary to issue general site-selection guidelines that DOE then would use to determine which candidate sites to recommend for site characterization. 42 U.S.C. § 10132(a)-(b). The Secretary initially would nominate at least five sites and then narrow the field to three for the President's consideration. 42 U.S.C. § 10132(b)(1)(A)-(B). Upon the President's approval of the nominated sites, DOE would conduct site characterization of each location. 42 U.S.C. § 10133(a). After completing site characterization, the Secretary would submit to the President, together with a final environmental impact statement ("FEIS"), a recommendation to approve a site suitable for development as a repository. 42 U.S.C. § 10134(a)(1). The President subsequently would transmit his recommendation to Congress. 42 U.S.C. § 10134(a)(2). "The state within which the recommended site was located could submit a 'notice of disapproval' to Congress, an action that would effectively end the development process with respect to that site unless Congress passed a joint resolution overriding the state's disapproval and approving the site." *Nuclear Energy Inst., Inc.,* 373 F.3d at 1259 (citing 42 U.S.C. § 10136(b)(2)).

Pursuant to the NWPA, DOE nominated five candidate sites for characterization, and the DOE Secretary recommended three sites to the President. *Id.* Yucca Mountain, Nevada was among the three sites. *Id.* The President approved each site for consideration. *Id.*

In 1987, Congress enacted the Nuclear Waste Policy Amendments Act ("NWPAA") directing that DOE characterize only Yucca Mountain, Nevada for possible site selection as the nation's nuclear repository. Pub.L. No. 100–203, §§ 5001–65, 101 Stat. 1330, 1330–227 to 1330–255 (1987); 42 U.S.C. § 10133(a), § 10172(a)(1)-(2). In February 2002, the DOE Secretary recommended to the President that he approve Yucca Mountain as a suitable repository site. Recommendation by the Secretary of Energy Regarding the Suitability of the Yucca Mountain Site for a Repository Under the Nuclear Waste Policy Act of 1982 at 6 (Feb.2002), at http://www.ocrwm.doe.gov/ymp/sr/sar.pdf. On July 23, 2002, the President signed the Yucca Mountain Development Act ("YMDA"), Pub.L. No. 107–200, approving the Yucca Mountain site for the development of a nuclear waste repository. *Nuclear Energy Inst., Inc.,* 373 F.3d at 1301. Nevada subsequently submitted its notice of disapproval. *Id.* Congress passed a joint resolution overriding Nevada's objection, and approved the development of a repository at Yucca Mountain. *Id.; see also* Pub.L. No. 107–200, 116 Stat. 735.

DOE currently is preparing an application for a license to construct a nuclear waste repository at Yucca Mountain and DOE expects to submit the application to the Nuclear Regulatory Commission ("NRC") by the end of the year. (Defs.' Mot. to Dismiss, Ex. 1 at ¶¶ 2–3, 7.) The NRC is charged with reviewing the application and deciding whether to authorize construction of the facility and whether to issue a license for DOE to receive and possess spent nuclear fuel and high level radioactive waste at the facility. 42 U.S.C. § 10141(b).

Additionally, DOE recently issued a Record of Decision adopting a primarily rail option for transporting nuclear waste to Yucca Mountain should it be approved as a repository. (Defs.' Mot. to Dismiss, Ex. 1 at ¶ 7.) DOE currently is preparing an environmental impact statement on the most appropriate rail alignment, with a Record of Decision expected by the end of 2006. (*Id.*)

Plaintiffs filed this action claiming Defendants' plan to dispose of nuclear waste at Yucca Mountain violates the Treaty of Ruby Valley because nuclear waste disposal is not one of the authorized uses for the land set forth in the Treaty. (Compl.[Doc.# 1].) Plaintiffs' Complaint alleges four claims. First, Plaintiffs claim they are entitled to a Writ of Prohibition preventing Defendants from authorizing or approving any action designed to permit or condone establishment of a nuclear repository at Yucca Mountain or construction of a rail line to transport nuclear waste to Yucca Mountain. (Id. ¶¶ 29–39.) Second, Plaintiffs request the Court enjoin Defendants from implementing their plan to construct a repository at Yucca Mountain or to construct a rail line to transport waste to Yucca Mountain. (Id. ¶¶ 40–47.) Third, Plaintiffs request a declaratory judgment that Defendants' plan to dispose of nuclear waste at Yucca Mountain violates the Treaty. (Id. at ¶¶ 48–52.) Finally, Plaintiffs request this Court set aside and hold unenforceable the past approvals, permits, and activities at Yucca Mountain. (Id. at ¶¶ 53–61.)

Defendants move to dismiss the Complaint, arguing this Court has no jurisdiction because Plaintiffs lack standing; the United States has not waived its sovereign immunity; Plaintiffs' claims are not ripe; jurisdiction for two claims lies with the Court of Appeals; and the Indian Claims Commission Act's exclusive jurisdiction and finality of adjudications bar Plaintiffs' claims. Additionally, Defendants argue the Court should dismiss the Complaint because Plaintiffs fail to state a claim as Plaintiffs have no ownership or occupancy rights to enforce under the Treaty of Ruby Valley.

Plaintiffs respond that this Court has jurisdiction because Plaintiffs' ancestors were parties to the Treaty and thus they have standing; sovereign immunity does not apply where a co-signor of a treaty seeks equitable relief to enforce the treaty; jurisdiction lies in this Court, not the Court of Appeals because Plaintiffs' claims do not arise under the NWPA; and Plaintiffs' claims are ripe because only pure questions of law remain. Additionally, Plaintiffs mount various challenges to prior litigation involving adjudication of Western Shoshone land title and use or occupancy rights. Finally, Plaintiffs assert that title to the land is irrelevant because the Treaty contains restrictive covenants that run with the land regardless of who holds title to the land.

## II. LEGAL STANDARDS

 In considering a motion to dismiss, "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 135 F.3d 658, 661 (9th Cir.1998) (citation omitted). However, the Court does not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in the plaintiff's complaint. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 754–55 (9th Cir.1994). There is a strong presumption against dismissing an action for failure to state a claim. *See Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir.1997) (citation omitted). The issue is not whether Plaintiff ultimately will prevail, but whether he may offer evidence in support of his claims. *See id.* at 249 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Consequently, the Court may not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d

80 (1957); *see also Hicks v. Small,* 69 F.3d 967, 969 (9th Cir.1995).

The liberal rules of notice pleading set forth in the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts supporting his claim. *See Yamaguchi v. U.S. Dep't of the Air Force,* 109 F.3d 1475, 1481 (9th Cir.1997) (quoting *Conley v. Gibson,* 355 U.S. at 47, 78 S.Ct. 99). All the Rules require is a "short and plain statement" that adequately gives the defendant "fair notice of what the plaintiffs claim is and the grounds upon which it rests." *Id.* (citations and internal quotations omitted). A claim is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, even if the complaint asserts the wrong legal theory or asks for improper relief. *See United States v. Howell,* 318 F.2d 162, 166 (9th Cir.1963).

## III. DISCUSSION

"The United States, as a sovereign, is immune from suit unless it has waived its immunity." *Balser v. Dep't of Justice, Office of U.S. Tr.,* 327 F.3d 903, 907 (9th Cir.2003). Sovereign immunity is a jurisdictional bar if the United States has not consented to be sued on a particular claim. *Id.* The United States must express unequivocally its waiver of sovereign immunity, and the terms of the waiver define the court's jurisdiction. *Id.* Absent such a waiver, sovereign immunity bars both equitable and legal claims. *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil and Gas Conservation of State of Mont.,* 792 F.2d 782, 792 (9th Cir.1986). "A party bringing an action against the United States 'bears the burden of demonstrating an unequivocal waiver of immunity.'" *Graham v. Fed. Emergency Mgmt. Agency,* 149 F.3d 997, 1005 (9th Cir.1998) (quoting *Mitchell v. United States,* 787 F.2d 466, 467 (9th Cir. 1986)). A suit against an officer of the United States in his or her official capacity is an action against the United States, and thus subject to the sovereign immunity defense. *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation,* 792 F.2d at 792.

Plaintiffs have identified 28 U.S.C. §§ 1331, 1353, 1362, 2201 and 2202 as providing this Court jurisdiction in this matter. (Compl. [Doc. # 1] at 1.) Additionally, Plaintiffs identify as the United States' waiver of sovereign immunity the Administrative Procedures Act, 5 U.S.C. § 702. (Pls.' Reply in Supp. of Mot. for Prelim. Inj. [Doc. # 7] at 4–5.) Finally, Plaintiffs assert they need not identify a specific waiver of sovereign immunity where a sovereign co-signor of a treaty sues the United States for violating the treaty. (Opp'n to Mot. to Dismiss [Doc. # 23] at 8.)

### A. Title 28 §§ 1331, 1353, 1362, 2201 and 2202

Plaintiffs identify the jurisdictional bases for this Court to hear this action as 28 U.S.C. §§ 1331, 1353, 1362, 2201 and 2202. Defendants argue these provisions may establish the Court's jurisdiction, but they do not constitute specific waivers of the United States' sovereign immunity.

"A statute may create subject matter jurisdiction yet not waive sovereign immunity." *Powelson v. U.S., By & Through Sec'y of Treasury,* 150 F.3d 1103, 1105 (9th Cir.1998). Title 28 U.S.C. §§ 1331 and 1362 create jurisdiction, but do not waive the United States' sovereign immunity. *See Pit River Home and Agr. Co-op., Ass'n v. U.S.,* 30 F.3d 1088, 1098 n. 5 (9th Cir.1994) (citing *Holloman v. Watt,* 708 F.2d 1399, 1401 (9th Cir.1983)) (section 1331); *Scholder v. U.S.,* 428 F.2d 1123, 1125 (9th Cir.1970) (section 1362). Additionally, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, does not constitute the United States' consent to be sued, it "merely grants an additional remedy in

cases where jurisdiction already exists in the court." *Brownell v. Ketcham Wire & Mfg. Co.*, 211 F.2d 121, 128 (9th Cir.1954). Section 1353 grants district courts original jurisdiction over "any civil action involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any Act of Congress or treaty." 28 U.S.C. § 1353. An "allotment" is a "term of art in Indian law," and means "a selection of specific land awarded to an individual allottee from a common holding." *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 142, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Section 1353 therefore is "a limited consent by the United States to suit." *Scholder*, 428 F.2d at 1126.

■■■■ The Court finds that Sections 1331, 1362, 2201, and 2202 are not waivers of sovereign immunity, and thus Plaintiffs cannot rely on those provisions as specific waivers of the United States' sovereign immunity. Additionally, Plaintiffs' reliance on § 1353 is misplaced. That statute is a limited waiver applicable only to cases where an individual sues on an allotment. The Treaty of Ruby Valley does not involve a selection of specific land to any individual allottees from a common holding. Plaintiffs' claims have no connection to any allotment as that term is used in § 1353. Accordingly, none of the cited statutes under Title 28 constitute a waiver of the United States' sovereign immunity in this case.

### B. Administrative Procedures Act

Plaintiffs assert the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, is an explicit waiver of sovereign immunity permitting this suit. Defendants argue the APA permits challenges only to final agency actions. Defendants contend that because numerous actions must take place

before Yucca Mountain is constructed, licensed, and begins accepting nuclear waste, Plaintiffs' claims are premature.

■■■■ The APA provides for judicial review of agency actions causing legal wrongs or adversely affecting a person within the meaning of a relevant statute.[1] 5 U.S.C. § 702. The APA is a specific waiver of the United States' sovereign immunity for actions for non-monetary relief brought under 28 U.S.C. § 1331. *See Cabrera v. Martin*, 973 F.2d 735, 741 (9th Cir.1992) ("[T]his Court has repeatedly found that § 702 waives the sovereign immunity of the United States with respect to any action for injunctive relief under 28 U.S.C. § 1331."); *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation*, 792 F.2d at 793. The APA's waiver of sovereign immunity is limited, however. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir.1998). It does not extend to claims for money damages, or to claims another statute prohibits. *Id.* Additionally, judicial review under the APA is limited to either review specifically authorized in a substantive statute, or "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

Plaintiffs bring claims for injunctive and declaratory relief, and no statute appears to prohibit their claims. However, a statute must authorize review of Plaintiffs' claims, or Plaintiffs must challenge final agency action.

#### 1. Statutory Review

■■■■ Plaintiffs do not identify a substantive statute specifically authorizing judicial review of Plaintiffs' claims. Defendants assert at least some of Plaintiffs' claims fall within the review procedures outlined in the NWPA.

---

**1.** Defendants have not argued Plaintiffs have not suffered a legal wrong or are not adverse-

ly affected within the meaning of a relevant statute.

The APA's waiver of sovereign immunity applies where another substantive statute specifically authorizes review of agency action. 5 U.S.C. § 704. However, where the substantive statute applies, that statute's review procedures control so long as they provide an adequate remedy. *See* 5 U.S.C. § 703 ("The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action ... in a court of competent jurisdiction."); *see also Bowen v. Mass.*, 487 U.S. 879, 903, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *Owner–Operators Indep. Drivers Ass'n of Am., Inc. v. Skinner*, 931 F.2d 582, 585 (9th Cir.1991); *Pub. Util. Comm'r of Or. v. Bonneville Power Admin.*, 767 F.2d 622, 627 (9th Cir.1985).

Section 10139 of the NWPA provides that the Court of Appeals shall have original and exclusive jurisdiction over any civil action:

(A) for review of any final decision or action of the Secretary, the President, or the Commission under this part;

(B) alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this part;

(C) challenging the constitutionality of any decision made, or action taken, under any provision of this part;

(D) for review of any environmental impact statement prepared pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) with respect to any action under this part, or as required under section 10155(c)(1) of this title, or alleging a failure to prepare such statement with respect to any such action;

(E) for review of any environmental assessment prepared under section 10132(b)(1) or 10155(c)(2) of this title; or

(F) for review of any research and development activity under subchapter II of this chapter.

42 U.S.C. § 10139(a). Section 10139 appears in Part A of Title 42, Chapter 108, and is entitled "Repositories for Disposal of High-level Radioactive Waste and Spent Nuclear Fuel." Part A includes such activities as recommending sites for characterization, site characterization, site approval and construction authorization, and congressional review of repository site selection. *See* 42 U.S.C. §§ 10132–35.

To the extent the NWPA specifically authorizes judicial review of agency action concerning site recommendation, characterization, approval, and congressional review of Yucca Mountain as a nuclear repository, this Court would not have jurisdiction over any claims that such decisions violate the Treaty of Ruby Valley. Jurisdiction would lie in the Court of Appeals pursuant to § 10139 of the NWPA. Further, should § 10139's review provisions apply, "[t]here is no reason to believe appellate review will be inadequate." *Pub. Util. Comm'r of Or. v. Bonneville Power Admin.*, 767 F.2d 622, 627 (9th Cir.1985) (citing *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984)).

### 2. Final Agency Action

Plaintiffs assert the NWPA does not apply, however, because they do not assert their claims under that statute. Defendants argue the APA's waiver of sovereign immunity does not apply because Plaintiffs do not challenge "final" agency action.

 In the absence of a statute providing for substantive review, a court may review only "final" agency action under the APA. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 124 S.Ct. 2373,

2378, 159 L.Ed.2d 137 (2004); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Agency action is "final" if (1) it "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) it determines rights or obligations, or legal consequences flow from it. *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Indicia of finality include: the challenged action imposes an obligation or fixes a legal relationship; the action is a definitive statement of the agency's position; the action has a direct and immediate effect on the complaining parties' day-to-day business; the action has the status of law; immediate compliance with the terms is expected; and the question before the court is a legal one. *See Assoc. of Am. Med. Colls. v. U.S.*, 217 F.3d 770, 780 (9th Cir.2000); *Mt. Adams Veneer Co. v. U.S.*, 896 F.2d 339, 343 (9th Cir.1989). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Mass.*, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992).

▮▮▮▮ The APA's finality requirement is grounded in the policy that judicial review should be limited to "concrete disputes over meaningful interests, rather than abstract disputes over hypothetical governmental actions." *Nat'l Wildlife Fed'n v. Goldschmidt*, 677 F.2d 259, 263 (2d Cir.1982) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). Courts should not engage in review "where pending administrative proceedings or further

agency action might render the case moot and judicial review completely unnecessary." *Sierra Club v. U.S. Nuclear Regulatory Comm'n*, 825 F.2d 1356, 1362 (9th Cir.1987). Courts should interpret the APA's finality requirement pragmatically and flexibly, with these policy concerns in mind. *See Assoc. of Am. Med. Colls.*, 217 F.3d at 780; *Nat'l Wildlife Fed'n*, 677 F.2d at 263. Thus, where an agency action's impact on the plaintiff is neither immediate nor certain, judicial review under the APA is unwarranted. *See Nat'l Wildlife Fed'n*, 677 F.2d at 263 (finding no final agency action where proposed highway may never be built); *Rapid Transit Advocates, Inc. v. S. Cal. Rapid Transit Dist.*, 752 F.2d 373, 378–79 (9th Cir.1985) (finding no final agency action where agency decided to fund design work but where subway may never actually be built).

▮▮▮▮ The challenged actions in this case are not final because the decisionmaking process regarding whether Yucca Mountain will become a nuclear repository is not completed. Although DOE has recommended, and Congress has approved,[2] Yucca Mountain as a proposed nuclear repository, DOE still must apply for and receive a license before any nuclear waste can be shipped and stored there. Only if NRC approves DOE's application will agency action have a direct and immediate effect on Plaintiffs' day-to-day business. DOE's interim, preliminary steps in moving towards that possible result do not directly affect Plaintiffs because DOE's decision to apply for a license does not result in nuclear waste being stored at Yucca Mountain, and does not ensure that will be the result.[3]

---

2. Even if DOE's decisionmaking process regarding recommending Yucca Mountain as a repository were a final agency action, Congress' subsequent approval of that recommendation is not subject to review under the APA because Congress is not an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1)(A).

3. *Cf. Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1088–91 (9th Cir.2003) (finding agency's preliminary decision was final agency action because preliminary decision pre-determined the result in second tier of decisionmaking process and plaintiff was making a claim for a procedural violation under the

Additionally, DOE has not completed its decisionmaking process regarding methods or routes for transporting waste to Yucca Mountain, should it be licensed. DOE currently is preparing a draft environmental impact statement regarding rail alignment, and expects to issue a record of decision in 2006. Among the options DOE is considering is a "no action" option, which would result in no rail line being built in Nevada. *See* Notice of Intent to Prepare an Envtl. Impact Statement for the Alignment, Constr., and Operation of a Rail Line to a Geologic Repository at Yucca Mountain, Nye County, Nev., 69 Fed.Reg. 18565, 18568 (Apr. 8, 2004). Accordingly, Plaintiffs' challenge to the construction of a proposed railroad to transport nuclear waste also is premature because alignment and construction of a railroad for that purpose is uncertain.

This Court is aware, of course, that evaluation, design and construction of a nuclear waste repository at Yucca Mountain has been the subject of considerable debate and activity for more than two decades. Still, a nuclear repository at Yucca Mountain has never been licensed and may never be licensed. Notwithstanding the sincerity and fervor of Plaintiffs' arguments, this Court's intervention at this time would resolve only a hypothetical dispute based on possible future events. This result is not permitted under the APA's limited waiver of sovereign immunity. Accordingly, the APA's waiver of sovereign immunity does not apply under the present circumstances in this case.

## C. Sovereign Co–Signors of a Treaty

■ Plaintiffs assert that because they are sovereign co-signors of the Treaty of Ruby Valley, they need not identify an explicit waiver of the United States' sovereign immunity to subject it to suit. Defendants respond that the Court cannot imply a waiver of sovereign immunity from the Treaty because waivers must be explicit.

■ "In the absence of specific language in the treaty waiving the sovereign immunity of the United States, the treaty must be interpreted in accord with the rule that treaty violations are normally to be redressed outside the courtroom." *Canadian Transp. Co. v. U.S.*, 663 F.2d 1081, 1092 (D.C.Cir.1980). As the Supreme Court has explained:

A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress.

*Edye v. Robertson*, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884). Accordingly, to maintain a civil action seeking to enforce a treaty against the United States, the plaintiff must show an explicit waiver of sovereign immunity permitting such a suit. *See U.S. v. Seminole Nation*, 299 U.S. 417, 421–25, 57 S.Ct. 283, 81 L.Ed. 316 (1937) (dismissing for lack of jurisdiction suit brought to enforce treaty and other rights where Congress had authorized by statute suits only for limited time; untimely amendment adding claims barred because the United States may not be sued without its consent).[4]

National Environmental Policy Act, which becomes ripe upon the violation).

4. Congress subsequently enacted a statute permitting the untimely claims to be adjudi-

cated. *See Seminole Nation v. U.S.*, 316 U.S. 286, 288–89 n. 2, 62 S.Ct. 1049, 86 L.Ed. 1480, 86 L.Ed. 1777 (1942).

The cases upon which Plaintiffs rely do not support their position. In *Wash. v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, the United States initiated the related action, and therefore no waiver of sovereign immunity was at issue. 443 U.S. 658, 669–70, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). In *Skokomish Indian Tribe v. United States*, the United States Court of Appeals for the Ninth Circuit concluded the tribe's claims that the United States breached its treaty obligations arose, if at all, under an explicit waiver of sovereign immunity in the Tucker Act or the Indian Tucker Act. 410 F.3d 506, 510–11 (9th Cir.2005). The Ninth Circuit thus transferred the litigation to the Court of Federal Claims, which has exclusive jurisdiction over claims brought under those statutes. *See id.*

The Treaty of Ruby Valley contains no explicit waiver of sovereign immunity permitting civil enforcement of the Treaty between the signatories. The mere fact that the United States was a signatory to the Treaty does not constitute an explicit waiver of sovereign immunity. Barring some other waiver, the United States' alleged treaty violations may not be redressed by a civil suit in this Court. Plaintiffs have failed to identify an express waiver of the United States' sovereign immunity applicable in this case.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss (Doc. # 16) is hereby GRANTED. Plaintiffs' Complaint is hereby DISMISSED for lack of jurisdiction.

### *ORDER DENYING RECONSIDERATION*

Plaintiffs, Western Shoshone National Council and four individual Western Shoshones, commenced this action on March 4, 2005, claiming Defendants' plan to dispose of nuclear waste at Yucca Mountain violates the Treaty of Ruby Valley because nuclear waste disposal is not one of the authorized uses for the land set forth in the Treaty. (Compl.[Doc.# 1].)

Defendants moved to dismiss the Complaint, arguing, among other things, that Plaintiffs' claims are not ripe. The Court granted this motion, finding the Administrative Procedures Act ("APA") was the only applicable waiver of sovereign immunity Plaintiffs identified. (Order [Doc. # 27] dated Oct. 31, 2005 at 8–15.) The Court further found Plaintiffs' claims were not ripe under the APA because no final agency action licensed Yucca Mountain as the nation's nuclear repository, nor had an agency made a final decision about, or began construction on, a rail route to transport nuclear waste to Yucca Mountain. (*Id.* at 11–13.) Finally, the Court noted that the Treaty of Ruby Valley itself did not contain a waiver of sovereign immunity, and barring some other identified waiver, the United States' alleged treaty violations could not be redressed in a civil suit in this Court. (*Id.* at 14–15.)

On November 10, 2005, Plaintiffs filed a Request for Reconsideration of Court's Grant of Motion to Dismiss (Doc. # 29). Defendants filed an Opposition to Plaintiffs' Motion for Reconsideration (Doc. # 30) on November 23, 2005, and on December 13, 2005, Plaintiffs filed a Reply Memorandum (Doc. # 31).

Plaintiffs argue that although foreign sovereign nations may have to resort to remedies outside the courtroom to redress the United States' treaty violations, that principle does not apply to Indian tribes within the United States. Plaintiffs assert that permitting the United States to enter into treaties with Indian tribes without allowing the tribes access to federal courts to enforce those treaties creates a right without a remedy. Additionally, Plaintiffs argue the United States sufficiently has

indicated an intent to dispose of nuclear waste at Yucca Mountain to make agency action final. Plaintiffs further argue the Court's Order dismissing the case for lack of ripeness permits the United States to continually alter the balance of hardships in any future request for an injunction because the United States will have expended even greater funds on the project. Defendants respond that Plaintiffs have not raised any new arguments, and are re-arguing issues this Court already has decided.

## I. LEGAL STANDARD

■ Reconsideration of a prior ruling is appropriate only in limited circumstances, such as the discovery of new evidence, an intervening change in controlling law, or where the initial decision was clearly erroneous or manifestly unjust. *Nunes v. Ashcroft,* 375 F.3d 805, 807–08 (9th Cir. 2004). A motion for reconsideration is not an avenue to re-litigate the same issues and arguments upon which the court already has ruled. *Brogdon v. Nat'l Healthcare Corp.,* 103 F.Supp.2d 1322, 1338 (N.D.Ga.2000).

## II. DISCUSSION

■ Federal district courts are courts of limited jurisdiction, and a party seeking to invoke this Court's jurisdiction bears the burden of establishing jurisdiction. *See U.S. v. Sumner,* 226 F.3d 1005, 1010 (9th Cir.2000); *State of Idaho ex rel. Trombley v. U.S. Dep't of Army, Corps of Eng'rs,* 666 F.2d 444, 446 (9th Cir.1982). Additionally, federal district courts lack jurisdiction over suits against the United States unless the United States has expressly and unequivocally waived its sovereign immunity. *Balser v. Dep't of Justice, Office of U.S. Tr.,* 327 F.3d 903, 907 (9th Cir.2003). Therefore, where the United States is the defendant, the plaintiff must show both subject matter jurisdiction and that the United States has waived its sovereign immunity. *Powelson v. United States, By and Through Sec'y of Treasury,* 150 F.3d 1103, 1104 (9th Cir.1998) ("[i]n an action against the United States, *in addition* to statutory authority granting subject matter jurisdiction, there must be a waiver of sovereign immunity." (emphasis in original) (quotations omitted)).

■ Plaintiffs argue this Court should reverse "its ruling that the courts have no jurisdiction to adjudicate Western Shoshone rights under the Treaty" as sovereign co-signors of the Treaty. Plaintiffs misconstrue this Court's prior ruling. The Court did not rule that the Western Shoshone have no means to enforce their treaty rights in federal court. Rather, the Court ruled that like any other plaintiff attempting to sue the United States in federal district court, Plaintiffs must establish both subject matter jurisdiction and a waiver of sovereign immunity, and that Plaintiffs had failed to do so. To the extent Plaintiffs argue Indian tribes attempting to enforce treaties are exempt from this requirement, the Court disagrees. (*See* Order [Doc. # 27] dated Oct. 31, 2005 at 14–15.)

Plaintiffs cite *Mescalero Apache Tribe v. Rhoades,* 755 F.Supp. 1484 (D.N.M.1990), *Pueblo of Taos v. Andrus,* 475 F.Supp. 359 (D.D.C.1979), and *Charrier v. Bell,* 547 F.Supp. 580 (M.D.La.1982), for the proposition that 28 U.S.C. § 1362 creates subject matter jurisdiction for which no waiver of sovereign immunity is required where an Indian tribe sues the United States only for equitable relief. These are all cases from district courts outside the Ninth Circuit. The Ninth Circuit Court of Appeals has made clear that the United States' sovereign immunity applies to both legal and equitable claims, and that § 1362 is a source of subject matter jurisdiction but it is not a waiver of sovereign immunity. *See Assiniboine & Sioux Tribes of*

*Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation of State of Mont.,* 792 F.2d 782, 792–93 (9th Cir.1986) (citing *Scholder v. United States,* 428 F.2d 1123, 1125 (9th Cir.1970)).

Finally, the Court reiterates it has not determined that the Western Shoshone cannot, at some point and in some forum, attempt to enforce its alleged treaty rights. Rather, the Court found the only potentially applicable waiver of sovereign immunity Plaintiffs identified was the APA. The APA is a specific waiver of the United States' sovereign immunity for actions for non-monetary relief brought under 28 U.S.C. § 1362. *See Assiniboine & Sioux Tribes of Fort Peck Indian Reservation,* 792 F.2d at 793. Judicial review under the APA is limited, however, to either review specifically authorized in a substantive statute, or "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

Plaintiffs have not identified a substantive statute specifically authorizing judicial review of Plaintiffs' claims at this stage, nor a "final" agency action under the APA. Simply stated, the decisionmaking process regarding whether Yucca Mountain will become a nuclear repository is not completed. DOE still must apply for and receive a license before any nuclear waste can be shipped and stored there. Only if NRC approves DOE's application will agency action have a direct and immediate effect on Plaintiffs.

The Court appreciates Plaintiffs' argument that the Court's ruling may affect future analyses of the balance of hardships if and when Yucca Mountain is licensed and Plaintiffs then seek an injunction. However, that is not a basis for establishing jurisdiction where it otherwise does not exist. Although this argument does not affect the Court's ruling in this case, the United States is unquestionably on notice of Plaintiffs' potential claims that using Yucca Mountain as a nuclear repository would violate the Treaty.

Plaintiffs essentially ask this Court to assume it is inevitable that Yucca Mountain will become the nation's nuclear repository. The Court cannot do so. As the United States' decisions regarding Yucca Mountain are incomplete and uncertain, and Plaintiffs' claims are not ripe under the APA. Any ruling by this Court that such a repository would violate the Treaty would be advisory. The Ninth Circuit has directed the lower courts not to engage in review where further agency action "might render the case moot and judicial review completely unnecessary." *Sierra Club v. U.S. Nuclear Regulatory Comm'n,* 825 F.2d 1356, 1362 (9th Cir.1987). Because agency action regarding Yucca Mountain is not "final" within the meaning of the APA, the APA's waiver of sovereign immunity does not apply, and this Court lacks jurisdiction over the action.

## III. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiffs' Request for Reconsideration of Court's Grant of Motion to Dismiss (Doc. # 29) is hereby DENIED.